# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00557-CR

---

**Matthew Houston, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 421ST DISTRICT COURT OF CALDWELL COUNTY
### NO. 22-036, THE HONORABLE CHRIS SCHNEIDER, JUDGE PRESIDING

---

## O P I N I O N

Matthew Houston was convicted of sexually assaulting J.C., who was the daughter of his girlfriend and a minor at the time of the alleged assault.[1] *See* Tex. Penal Code § 22.011. The jury assessed his punishment at twenty years' imprisonment, and the trial court rendered its judgment of conviction consistent with the jury's verdict.[2] *See id.* § 12.33. On appeal, he contends that the trial court denied him a fair trial with due process through its rulings on his and the State's objections at trial, that his trial attorneys provided ineffective assistance of counsel due to one of the attorney's conflict of interest, and that his constitutional rights were

---

[1] Because the alleged victim was a minor when the offenses occurred, we will refer to her by using a pseudonym and to her family members by their relationships to her. *See* Tex. R. App. P. 9.10 (defining sensitive information).

[2] Originally, the State also alleged that Houston committed the offense of indecency with a child, *see* Tex. Penal Code § 21.11, but the State later abandoned that count.

violated through the State's comments to the jury. We will affirm the trial court's judgment of conviction.

## BACKGROUND

In 2016, Mother became pregnant and gave birth to Houston's son. Approximately one year later, Houston moved in with Mother, Mother's oldest child J.C., Mother's second oldest child, and the young child he had with Mother. J.C. was approximately six years old when Houston moved in. After Houston moved in, three of his other children moved in with the family. Over a three-year period, Mother, Houston, and the six children moved to two apartments before moving to a house. In 2019, J.C. started middle school and exhibited behavioral issues at school and at home. J.C.'s biological father ("Father") had been in prison at the time Houston moved in, but Father was released in 2020.

On Valentine's Day in 2020, an investigator for the Department of Family and Protective Services ("Department") arrived at Mother and Houston's house after receiving a report concerning Houston's excessive discipline of one of his children. The investigator talked with the five children who were in the home and then drove to Maternal Grandmother's house where J.C. was temporarily staying. While speaking with the investigator, J.C. said that Houston touched her in an inappropriate and sexual way. At the time, J.C. was eleven years old. The investigator informed the police about the allegation, and J.C. and the other children were interviewed at a children's advocacy center. During her interview, J.C. recanted her claim that something improper happened with Houston and stated she had wanted to receive the type of positive attention she had seen someone else receive when the person made an outcry. The

police did not interview Mother or Houston or investigate the matter further. The Department later closed its case.

Approximately nine months later, J.C. spent the night at a friend's house in a nearby town. When Mother talked with J.C. on the phone and told her that it was time to come home, J.C. said that she did not want to. Mother told J.C. that she would report J.C. as having run away, and J.C. responded by saying that Houston had touched her sexually. J.C.'s friend's mother called the police to report what J.C. had said. The police met with Mother, and Mother informed them that J.C. had made a similar claim months earlier before recanting it. The officer taking the report concluded that J.C.'s allegation was unfounded, and the police did not investigate the matter further. J.C. returned home with Mother.

In November 2021, after J.C. turned thirteen, she called Paternal Grandmother and reported that Houston had sexually abused her. J.C. also sent Paternal Grandmother a recording that she had made with her phone. Although the recording is a video, the camera was covered at the time of the recording, so no visual images were captured. In the audio component, J.C. can be heard telling a man "no" and expressing that she did not want to do what was happening, and a man can be heard breathing heavily, whispering to J.C., and telling her that he wanted to ejaculate on her butt.[3] After Paternal Grandmother received the recording, she called the Department, and an investigator later discussed the claims with Mother. The Department also informed the police. Mother ended her relationship with Houston after J.C. made the third outcry.

---

[3] On the recording, the man uses the word "skeet," and testimony from the subsequent trial established that the term means to ejaculate.

As part of the investigation in this case, another forensic interview was scheduled for J.C. During the interview, J.C. did not want to and did not discuss the allegations she had made regarding Houston, but she did not recant her outcry. When the interviewer started to play the recording J.C. had made, J.C. said she wanted to leave and then left the interview room. After reviewing the recording and investigating the matter, the police arrested Houston.

During the trial, the recording J.C. made was admitted into evidence and played for the jury. In addition, the State called the following witnesses: J.C., Paternal Grandmother, Mother, a police officer involved in the investigation, two Department investigators, and the two forensic interviewers who interviewed J.C. In his case-in-chief, Houston called as witnesses his mother and the mother of his youngest child, who was born after Mother and Houston stopped living together. The witnesses testified regarding the events summarized above and provided additional detail as set out below.

In her testimony, J.C. related that she began viewing Houston as a father figure when he started living with her. She recalled that the relationship changed when she started going through puberty. At that time, he began touching her "private areas" or her "coochie" and her "boobs." Further, she stated that the touching increased in frequency as she got older and that Houston began expressing an interest in having sexual intercourse with her and having her "lick his middle part" where he "pee[s] out of." Regarding the frequency of these encounters, J.C. related that it happened every other night when she was home.

Next, J.C. testified that the family moved to a house in 2020. At the house, Houston began "put[ting] his thing" or "penis" into her "coochie" at night when everyone else was asleep. When discussing these incidents, J.C. related that Houston would tell her to be quiet

4

and would whisper to her and that the incidents occurred every night that she was in the home. She also stated that the penetration was painful.

Additionally, J.C. testified about the various outcries that she made. First, she stated that she told a Department investigator about the abuse and was later interviewed at a children's advocacy center. She remembered being scared during the interview because she was worried what would happen to her siblings and Houston's children if he were to get in trouble. She also related that she did not feel comfortable talking about the abuse. During her cross-examination, she admitted that she told the interviewer both that she made up the claim because she wanted to get positive attention and that she would have just left the house if there was abuse occurring; however, she also testified that she made those statements because she was scared and wanted the interview to end.

Next, J.C. explained that she made the second outcry when she spent the night with a friend who lived out of town. J.C. testified that she had not wanted to leave the friend's home because she was scared of returning to live with Houston. Further, she stated that Houston had previously threatened to hurt her family by saying that he would poison the family by turning on the gas in the home and that she was scared he would act on those threats.

Concerning the third outcry, J.C. testified that before making the outcry she wanted to give up and commit suicide because of the abuse. She related that she took multiple pills in an attempt to kill herself. Additionally, she stated that she also wanted to leave behind proof of what Houston had been doing to her to let people understand why she had decided to kill herself. Accordingly, J.C. put her phone under her pillow to record one of the assaults. Regarding the recorded incident, she remembered that he was "[t]rying to cum on [her] butt" after having sex with her. After waking up the following morning and realizing that her suicide

5

attempt was unsuccessful, she sent the recording to Paternal Grandmother, who called the Department. A forensic interview was scheduled, and J.C. testified that she was not ready to talk about the abuse, that she did not want to be interviewed, that she felt sad and overwhelmed, and that she left the interview when the interviewer started playing the recording she made because it brought back memories of the abuse.

Mother testified that an investigator came to their home in February 2020 to discuss a complaint regarding how Houston had been disciplining his sons. Although Mother acknowledged that J.C. made an outcry to the investigator, Mother testified that she did not hear about the allegations until later. Further, she stated that J.C. would shut down when asked about the allegations. When discussing the first forensic interview, Mother recalled being told that J.C. did not disclose any sexual abuse. Mother related that J.C. started becoming more rebellious and started having behavioral issues at school following the outcry.

Regarding the events leading up to the second outcry, Mother related that J.C. had spent the night with a friend. While at the friend's home, J.C. disclosed that she had been sexually abused, and the claim was reported to the police. During her cross-examination, Mother agreed that J.C. told the police that she made the second outcry to avoid having to go home. Mother recalled that J.C. did not make an outcry to the Department when questioned about the claim.

Concerning the third outcry, Mother testified that Paternal Grandmother called her and said she needed to talk with a Department investigator about another outcry by J.C. According to Mother, she believed the new allegations, confronted Houston, and moved out of the home with her children. When discussing the recording J.C. made, Mother stated that the

two voices on the recording belonged to J.C. and Houston. Further, Mother testified that Houston would make similar whispering sounds when they had sex.

In her testimony, Paternal Grandmother stated that J.C. was fun and loving but changed as she got older and became sad and angry. Paternal Grandmother related that she noticed cuts on J.C.'s body indicating that she was engaging in acts of self-harm. Further, Paternal Grandmother testified that J.C. sent her the recording in November 2021 and that J.C.'s and Houston's voices were on the recording. Paternal Grandmother related that she recognized Houston's voice because she would talk to him during parties, spoke with him on a monthly basis, and would hear his voice in the background when she was talking to J.C. on the phone.

When presenting his case, Houston called his mother as a witness, who testified that J.C. had emotional issues from the time that she was a little girl and would be defiant. Houston's mother testified that Houston's voice was not on the recording made by J.C. and that Houston had denied abusing J.C. Next, Houston called the mother of his youngest child, who testified that Houston's voice was not on the recording, that he did not refer to ejaculation as "skeet," that Father had allowed J.C. to be present and hang out with his friends when they were drinking alcohol and smoking marijuana, and that she saw J.C. walking in a dangerous part of town.

After considering the evidence presented at trial, the jury found Houston guilty of sexual assault of a child.

During the punishment phase, the State called an expert on the effects of sexual abuse on children, and she explained that the symptoms can last a long time, that healing can be a lifelong process, and that victims can worry about seeing offenders or about their reoffending if they are not sent to prison.

Houston called as witnesses his mother, a community-supervision officer, and a teacher who either taught or had some involvement with Houston's children through their school. The teacher testified that one of Houston's children had a mental illness, that Houston tried his best to help the child, that he was a good father, that his going to prison would have a significant impact on all of his children, and that she had no concerns about his being around children and did not believe he would hurt children. Houston's mother testified that for years he had been the sole parent for his older children after the children's mother left, that he was a loving father and good provider, that the children would be negatively impacted if he were sent to prison, that he and the children would lose his disability benefits if he were imprisoned, and that she could not financially care for all the children on her own.

The community-supervision officer talked about different conditions of community supervision that can be imposed, including ordering that the offender have no contact with a victim, commit no new offenses, and complete treatment through a sex-offender program, which can last for years. He further explained that convicted sex offenders are required to regularly register as sex offenders and that the failure to register is a felony offense. He testified that sex offenders can be rehabilitated but agreed that an offender could contact a victim if he wanted to and that some people placed on community supervision do reoffend.

After considering the evidence presented in the punishment phase, the jury assessed Houston's punishment at twenty years' imprisonment, and the trial court rendered its judgment of conviction accordingly. Houston filed a motion for new trial in which he generally asserted that his conviction was "contrary to the law and evidence." The motion was overruled by operation of law without a hearing. *See* Tex. R. App. P. 21.8.

Houston appeals his conviction.

## DISCUSSION

In his first issue on appeal, Houston contends that the trial court "repeatedly abused its discretion" when making certain rulings "before and during trial" and, thereby, "denied [him] a fair trial with due process of law." In his second issue, he contends that he was denied the effective assistance of counsel because one of his trial attorneys had a conflict of interest. In his last issue on appeal, he argues that the State made improper arguments that violated his right to a fair trial.

### Trial Court Rulings

*Motion for Continuance*

In his first set of arguments in his first issue, Houston contends that the trial court abused its discretion by denying his motion for continuance, filed six days before trial. He asserts that he explained in the motion that a continuance was necessary because he was solely responsible for caring for his children, including one son who was autistic and had attention deficit hyperactivity disorder, and because he needed time to prepare and enroll the children in school and to find a place for the children to live if he were convicted. In his brief, he asserts that he was harmed by the trial court's ruling and, as support, points to testimony given in the punishment phase by his mother in which she explained that he had been responsible for the children's care for several years and that the family would face financial and other hardships were he to be imprisoned. Houston also relies on testimony from the teacher who explained the role that Houston played in the care and education of his children. Further, he argues that following the jury's guilty verdict, "he was ripped away from his children without being able to make the necessary preparations to ensure their success."

9

Regarding continuances, the Code of Criminal Procedure provides that "[a] criminal action may be continued on the written motion of the State or of the defendant, upon sufficient cause shown; which cause shall be fully set forth in the motion." Tex. Code Crim. Proc. art. 29.03. The Code also lists certain instances in which a continuance may be requested, such as "the absence of a witness." *Id.* art. 29.06.

"A trial court's ruling on a motion for continuance is reviewed for an abuse of discretion." *Brumfield v. State*, 641 S.W.3d 568, 580 (Tex. App.—Tyler 2022, pet. ref'd). Under that standard, a trial court's ruling will be deemed an abuse of discretion only if it is so clearly wrong as to lie outside "the zone of reasonable disagreement," *Lopez v. State*, 86 S.W.3d 228, 230 (Tex. Crim. App. 2002), or is "arbitrary or unreasonable," *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). In reviewing the trial court's ruling, appellate courts bear in mind the general interest in the fair and efficient administration of justice. *Rosales v. State*, 841 S.W.2d 368, 375 (Tex. Crim. App. 1992). Appellate courts also look to the particular facts of the case and consider the "circumstances present in every case, particularly the reasons presented to the trial [court] at the time the request is denied." *Id.* at 374 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)). A ruling based on a motion seeking a continuance for equitable grounds "is particularly within the discretion of the trial court." *Walter v. State*, 581 S.W.3d 957, 984 (Tex. App.—Eastland 2019, pet. ref'd) (quoting *Gonzales v. State*, 304 S.W.3d 838, 844 n.11 (Tex. Crim. App. 2010)).

To prevail on a claim regarding the denial of a motion for continuance, the appellant must also show "that the denial 'actually and specifically prejudiced appellant's defense.'" *Cordova-Lopez v. State*, 680 S.W.3d 5, 12 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd) (quoting *Kinnett v. State*, 623 S.W.3d 876, 906 (Tex. App.—Houston [1st Dist.] 2020, pet.

10

ref'd)); *see Splawn v. State*, 160 S.W.3d 103, 108 (Tex. App.—Texarkana 2005, pet. ref'd). "Speculation will not suffice to obtain reversal for a trial court's failure to grant a continuance." *Kinnett*, 623 S.W.3d at 906; *see also Milem v. State*, No. 02-24-00201-CR, 2025 WL 1536399, at *3 (Tex. App.—Fort Worth May 29, 2025, pet. ref'd) (mem. op., not designated for publication) ("[S]peculative harm is not enough"; defendant "must demonstrate 'with considerable specificity how [he] was harmed by the absence of more preparation time than he actually had,' a showing that should ideally occur at a hearing on a new-trial motion." (quoting *Gonzales*, 304 S.W.3d at 842-43)).

In this case, Houston was indicted in February 2022 and arrested in April 2022. The trial had been set for April 2024, and Houston previously asked for a continuance before filing the second motion forming the basis for this issue. The trial setting was then moved to August 2024. *See Splawn*, 160 S.W.3d at 109 (determining that trial court did not abuse its discretion in denying pretrial continuance motion, in part, because defendant had already been in jail for 332 days and because trial had already been delayed "at least once"). Accordingly, Houston had months, if not years, to make arrangements for his children.

Additionally, Houston did not file the request until six days before the start of trial. *See Brooks v. State*, No. 11-22-00339-CR, 2024 WL 1200481, at *4 (Tex. App.—Eastland Mar. 21, 2024, pet. ref'd) (mem. op., not designated for publication) (concluding that trial court did not abuse its discretion by denying continuance where defense had months to prepare and did not file motion until Friday before trial). Importantly, Houston did not make the request for additional time for any of the reasons authorized by statute, such as securing a witness, or otherwise assert that a continuance was necessary to prepare for trial. *See* Tex. Code Crim.

11

Proc. art. 29.06; *see also Ortiz v. State*, 626 S.W.2d 586, 588 (Tex. App.—Amarillo 1981, pet. ref'd) (addressing motion for continuance seeking time to secure missing witness).

When presenting his claim, Houston has not shown how his *defense* was specifically prejudiced by the trial court's ruling. *See Cordova-Lopez*, 680 S.W.3d at 12. "Specific prejudice" to a defense resulting from the denial of a motion for continuance "may include unfair surprise, an inability to effectively cross-examine the State's witnesses, or the inability to adduce crucial testimony that could have been given by potential witnesses." *Tanguma v. State*, 47 S.W.3d 663, 680 (Tex. App.—Corpus Christi-Edinburg 2001, pet. ref'd), *disapproved of on other grounds by Valle v. State*, 109 S.W.3d 500 (Tex. Crim. App. 2003). Instead of arguing these or similar types of specific prejudice to his defense, Houston discusses speculative effects his conviction might have had on his family. "Furthermore, he did not file a motion for new trial or seek to obtain a post-judgment hearing to produce evidence regarding any actual harm he suffered during trial because of the denial of his motion for continuance." *Cordova-Lopez*, 680 S.W.3d at 14.

For these reasons, we cannot conclude "that the trial court abused its discretion by denying [Houston]'s motion for continuance." *Dotson v. State*, 146 S.W.3d 285, 297 (Tex. App.—Fort Worth 2004, pet. ref'd).[4]

---

[4] At the end of his briefing on this issue, Houston asserts without citation to any authority that the trial court's abuse of discretion in making this ruling violated his constitutional right to a fair trial and due process. However, Houston did not assert in his motion for continuance or otherwise at trial that failing to grant a continuance would violate any of his constitutional rights. *See* Tex. R. App. P. 33.1 (setting out requirements for preserving issue for appellate consideration); *see also Seghelmeble v. State*, 390 S.W.3d 576, 581 (Tex. App.—Dallas 2012, pet. ref'd) (concluding that defendant failed to preserve claims that failure to grant continuance violated his constitutional rights because he did not make those claims to trial court). Moreover, because his constitutional claim is predicated on the trial court's purported abuse of discretion, we cannot conclude that his constitutional rights were violated. *See Daniels v. State*,

12

*Photographs*

In his first issue, Houston also asserts that the trial court abused its discretion when making an evidentiary ruling pertaining to the second forensic interviewer. Before the second interviewer testified, a hearing was held outside the jury's presence in which the parties argued about the limits of the interviewer's testimony. At the hearing, the State informed the trial court that it would not seek to play a recording of the interview because the requirements for playing a forensic interview were not present here. The trial court clarified that the recording would not be admitted but ruled that the witness could testify.

Next, the State explained that it would not be attempting to enter into evidence what J.C. said at the interview. More specifically, the State said it would not "ask for specific statements that she ma[de] in that interview, responses about demeanor and body language and what happened in that interview." Following that exchange, one of Houston's two trial attorneys asked the trial court for permission to take still shots of the recording for use in trial. The attorney stated that she imagined that the witness would be "describing a lot of gestures by [J.C.] during the interview. And I want to make sure that -- that we have a way to rebut that if that's really not what the video shows." The State responded by saying that it would be improper to allow Houston to photograph the interview. However, the State did say that "as far as refreshing the interviewer's memory, we will have the interview here in court. And . . . we'll bring a headset if [Houston's attorneys] need[] to refresh his memory."

Houston's attorney stated that she would not be able to impeach the witness if he inaccurately testified concerning what he observed during the interview. The trial court

921 S.W.2d 377, 381 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd) ("Given these facts, we cannot say the denial of the motion for continuance was so arbitrary as to violate due process.").

13

responded, "Sure, you can. You can cross-examine him." But the trial court clarified that the attorney would not be able to use an actual photograph taken of the recording to do so. The State reiterated that it would have a copy of the recording in the courtroom with headphones that Houston's attorney could use to refresh the witness's memory and that the attorneys could then continue cross-examining the witness. Houston's attorney responded, "Okay. Well, hopefully we don't get to that point."

At trial, the interviewer testified during his cross-examination that he did not recall whether J.C. was biting her nails, rubbing her eyes, or crossing her arms, but he did testify that J.C. expressed that she did not want to be interviewed. Houston's attorneys did not attempt to refresh the interviewer's memory at any point during his testimony.

On appeal, Houston asserts that the trial court abused its discretion by sustaining the State's objection to his request for images of J.C. from the recording of her second forensic interview. Houston contends that the images were relevant and "could have meaningfully shown the jury [J.C.]'s demeanor while being interviewed about the alleged events" and emphasizes that the interviewer testified that he did not recall what J.C.'s demeanor was like during the interview. Further, Houston contends that the still photographs would have been the best evidence to show her demeanor.

Appellate courts review a trial court's ruling regarding the admission or exclusion of evidence for an abuse of discretion. *See Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). Under that standard, an appellate court reviews the trial court's ruling in light of the record before the court "at the time the ruling was made." *Khoshayand v. State*, 179 S.W.3d 779, 784 (Tex. App.—Dallas 2005, no pet.). Moreover, the ruling will be upheld provided that the trial court's decision "is reasonably supported by the record and is correct

14

under any theory of law applicable to the case." *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005).

Under article 39.14 of the Code of Criminal Procedure, the State is required to produce certain material evidence in its possession in a criminal proceeding. *See* Tex. Code Crim. Proc. art. 39.14(a). However, that provision sets out that it is subject to the restrictions contained in article 39.15 of the Code and section 264.408 of the Family Code. *See id.* Subsection 264.408(d-1) states that an electronic recording of an interview with a child under Section 264.408(d) is subject to production under article 39.14; however, it also states that a court "*shall deny any request* by a defendant to copy, photograph, duplicate, or otherwise reproduce an electronic recording" of such an interview provided that the prosecuting attorney makes the electronic recording reasonably available to the defendant in the same manner as property or material may be made available to defendants, attorneys, and expert witnesses under subarticle 39.15(d) of the Code of Criminal Procedure. *See* Tex. Fam. Code § 264.408(d-1) (emphasis added). Similarly, article 39.15 specifies that "[a] court shall deny any request by a defendant to copy, photograph, duplicate, or otherwise reproduce" forensic interviews of children. Tex. Code Crim. Proc. art. 39.15(c) (providing that although material described by section two of article 38.071 is discoverable, it may not be duplicated); *see id.* art . 38.071, § 2 (pertaining to "recording of an oral statement of the child" in sexual assault cases and cases involving similar crimes). Subarticle 39.15(d) provides that material is considered to be reasonably available to the defendant if at a facility under the control of the state, the state provides ample opportunity for the inspection, viewing, and examination of the material by the defendant, the defendant's attorney, and any individual the defendant seeks to qualify to provide expert testimony at trial. *See id.* art. 39.15(d).

Houston does not argue that the video was not made reasonably available to him; instead, he contends that the trial court should have allowed him to take photos of the recording. As set out above, the trial court was statutorily obligated to deny any request by Houston to photograph the recording. *See id.*; Tex. Fam. Code § 264.408(d-1); *see also* Tex. Gov't Code § 311.016 (explaining that use of word "[s]hall" in statute "imposes a duty"); *Allen v. State*, 675 S.W.3d 47, 50, 52-53 (Tex. App.—Tyler 2023, no pet.) (concluding that trial court did not abuse its discretion in denying defendant's motion seeking to copy forensic interview). Moreover, as previously discussed, when the trial court considered Houston's request, the State related that it would have the video available for Houston to use to refresh the interviewer's memory if needed, and the trial court explained that Houston could impeach the interviewer through cross-examination. *See In re State*, 670 S.W.3d 776, 780, 781 (Tex. App.—Texarkana 2023, orig. proceeding) (concluding that trial court abused its discretion by ordering State to provide copy of forensic interview—because law prohibits copying of forensic interview—after noting that State made interview available to defendant's counsel); *see also Davis v. Alaska*, 415 U.S. 308, 316 (1974) (explaining that cross-examination allows party to test witness's perception and memory and impeach or discredit witness).

For these reasons, we conclude that the trial court did not abuse its discretion by sustaining the State's objection to Houston's request to take photos of the video images from the second forensic interview.[5] *See* Tex. R. Evid. 101(d) (providing that evidence must be excluded if required by statute even if it could be admitted under Rules of Evidence).

---

[5] Like in the briefing for the previous set of arguments, Houston asserts at the end of this briefing without any citation to authority that the trial court's abuse of discretion in making its ruling violated his constitutional rights to a fair trial and due process. However, during the trial, Houston did not claim that preventing him from using photos would violate any of his

16

*Disparate Rulings*

In his final set of arguments in this issue, Houston contends that the trial court abused its discretion by overruling his objections to leading questions but sustaining the State's similar objections. The entirety of the briefing on this argument asserts as follows:

> Time and time again, the trial court overruled defense objections for leading while granting the State's objections on the same issue. *Compare* 3 RR 139, 142; 4 RR 142-143 *with* 4 RR 179, 193-95. Treating the parties differently when ruling on identical objections is the precise definition of an unfair trial and abuse of the trial court's discretion. These biased rulings allowed the State to guide its case and witnesses in a way that suited its arguments while denying the defense the same opportunity. Therefore, for the same reasons as argued previously, Mr. Houston's case should be reversed and remanded for additional proceedings in the trial court consistent with his federal and state constitutional rights.

Although Houston generally asserted that he was challenging the trial court's rulings on "leading" objections and provided cites to page spans in the record, he did not identify the specific objections that he is complaining about or discuss how those rulings were erroneous or indicated bias on behalf of the trial court. Further, he does not refer to any legal authority supporting the assertions that he is making on appeal.

Under the Rules of Appellate Procedure, a "brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." Tex. R. App. P. 38.1(i). A party must not only cite relevant authority but also provide substantive legal analysis. *Burton v. Prince*, 577 S.W.3d 280, 292 (Tex. App.—Houston [14th Dist.] 2019, no pet.). An appellate court is not required to construct an appellant's arguments

---

constitutional rights. *See* Tex. R. App. P. 33.1; *see also Clark v. State*, 365 S.W.3d 333, 340 (Tex. Crim. App. 2012) (concluding that defendant's evidentiary objections did not preserve claim for appellate consideration that his due-process rights were violated or that he was denied fair trial). Moreover, because his constitutional claim hinges on the trial court's having abused its discretion, we cannot conclude that his constitutional rights were violated.

with appropriate citations to the record and to legal authority. *Wolfe v. State*, 509 S.W.3d 325, 343 (Tex. Crim. App. 2017). Given the lack of briefing on this set of arguments, we conclude that these claims were not adequately briefed. *See Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2011) (determining that defendant's issue was inadequately briefed and presented nothing for review); *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) (same); *see also Urdaneta v. State*, Nos. 02-23-00338—00340-CR, 2024 WL 4377442, at *8 n.13 (Tex. App.—Fort Worth Oct. 3, 2024, no pet.) (mem. op., not designated for publication) (concluding that defendant inadequately briefed issue that trial court's comment expressed bias because he did "not offer a clear and concise argument explaining why the trial court's statement demonstrate[d]" bias).

Even if these arguments were adequately briefed, we would be unable to conclude that the trial court abused its discretion. Houston made no complaint to the trial court regarding the allegedly disparate rulings. Generally, to preserve error for appeal, a defendant must make a timely, specific objection, request, or motion to the trial court stating the specific grounds for the ruling sought by the complaining party, unless the specific grounds were apparent from the context. Tex. R. App. P. 33.1(a). Preservation of error is a "systemic requirement" on appeal. *See Darcy v. State*, 488 S.W.3d 325, 327 (Tex. Crim. App. 2016). "An appellant fails to preserve error by failing to object when he had the opportunity." *Burt v. State*, 396 S.W.3d 574, 577-78 (Tex. Crim. App. 2013). "To avoid forfeiting a complaint on appeal, the party must 'let the trial judge know what he wants, why he thinks he is entitled to it, and [] do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it.'" *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)). Appellate courts should not

address the merits of an issue that has not been preserved for appellate consideration. *See Blackshear v. State*, 385 S.W.3d 589, 591 (Tex. Crim. App. 2012).

Assuming these claims of bias could be addressed on appeal without an objection having been made, *see Avilez v. State*, 333 S.W.3d 661, 672 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (assuming without deciding that complaint regarding whether trial court's comments and rulings showed bias, "if valid, implicate[] the type of systemic error that we may address for the first time on appeal"), we would not be able to sustain this issue. Absent a clear showing of bias, we presume a trial court's actions were impartial. *See Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006); *Tovar v. State*, 619 S.W.3d 783, 792 (Tex. App.—San Antonio 2020, pet. ref'd).

In the referenced pages of the record, the trial court did not express any comment on the questions asked or answers provided and simply ruled on the leading objections in the following manner: overruling two of Houston's objections during Mother's testimony, overruling two of Houston's objections during J.C.'s testimony, sustaining the State's objection during Houston's mother's testimony, and sustaining two of the State's objections during the testimony of the mother of Houston's youngest child. "Unfavorable rulings do not alone show judicial bias or prejudice; rather, the judicial ruling must 'connote a favorable or unfavorable disposition or opinion that is somehow *wrongful or inappropriate*, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess . . . or because it is excessive in degree.'" *Tovar*, 619 S.W.3d at 792 (quoting *Abdygapparova v. State*, 243 S.W.3d 191, 198 (Tex. App.—San Antonio 2007, pet. ref'd)). "Only in the rarest circumstances are judicial rulings demonstrative of the degree of favoritism or antagonism required to show that a fair and impartial trial is impossible." *Rodriguez v. State*, 491 S.W.3d 18,

19

33 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd). "Such rulings are generally best brought as grounds for appeal, not as evidence of judicial bias." *Id.*

Moreover, the span of the record chosen by Houston does not contain all of the rulings by the trial court on the parties' leading objections. *See Tovar*, 619 S.W.3d at 792 (noting that trial courts "review the entire record" when evaluating claim that judge was biased). Although the trial court overruled five of Houston's leading objections and did not overrule any of the State's leading objections, the trial court through the entirety of the trial sustained leading objections five times each for both parties. Moreover, the parties made other objections during the trial, including objections asserting that the witnesses' answers were hearsay, nonresponsive, and speculative. The trial court sustained seventeen of Houston's objections but only sustained twelve of the State's objections.

Based on the foregoing and assuming that these claims are properly before this Court, we would conclude that the record does not clearly demonstrate bias and that Houston has not overcome the presumption that the trial court acted appropriately when asked to rule on the parties' objections. *See Brumit*, 206 S.W.3d at 645. Accordingly, we would not conclude, as Houston suggests, that the trial court abused its discretion or that his constitutional rights were violated. *See Avilez*, 333 S.W.3d at 675 ("[M]ost matters related to judicial conduct within the broad confines of the discretion traditionally afforded to a trial court do not implicate constitutional due process protections.").

For these reasons, we overrule Houston's first issue on appeal.

**Conflict of Interest**

In his second issue on appeal, Houston asserts that he was denied effective assistance of counsel because one of his trial attorneys had "an actual conflict of interest in [his] representation." As support, he references the following exchange when one of Houston's attorneys was cross-examining Paternal Grandmother:

[Attorney]: We know each other, don't we?

[Paternal Grandmother]: Yes, ma'am.

[Attorney]: Okay. I represented your son before; correct?

[Paternal Grandmother]: Yes, you have.

. . .

[Attorney]: Okay. So he got out in 2020? When did he go in?

[Paternal Grandmother]: I believe it had been five years. I think you were the attorney on the case. So you may know better than I do.

. . .

[Attorney]: Okay. And so around February of 2020, is it fair to say that [J.C.]'s dad was going to be getting out pretty soon from a long period of incarceration?

[Paternal Grandmother]: Around February of 2020, I don't believe it was known yet that he was getting out in May. Things had changed due to COVID.

After referencing this exchange, Houston notes that the indictment in this case alleged that the offense occurred in November 2021, which was after Father had been released. Houston further highlights that his defense team insinuated that someone else might have committed the offense and that it might have occurred while J.C. was in Father's custody, but Houston emphasizes that his defense team did not directly accuse Father of sexually assaulting J.C. Additionally, Houston contends that Father should have been "a central alternative suspect"

21

but that his attorney "did not seize the opportunity to accuse or aggressively pursue [Father]'s culpability or knowledge about what may have truly happened to the complainant." Houston also argues that his attorney's prior representation of Father "created an actual conflict of interest, where her duty of loyalty to her former client placed her in a position to choose between her former and current client's best interests." Due to this alleged actual conflict of interest, Houston asserts that his ineffective-assistance claim should not be reviewed using the traditional test and should instead employ a standard that is more favorable to him. He claims that by his attorney's "declining to fully exploit the suggestion that [Father] was involved and/or knew who was involved in this crime, [she] failed to advocate for . . . Houston zealously." Similarly, Houston contends that the conflict affected his attorney's performance because she limited her cross-examination of Paternal Grandmother and later limited her argument to the jury "to mere insinuations rather than forceful claims" despite "facts suggesting opportunity and possible motive." Houston insists that "counsel's divided loyalties negatively influenced the defense strategy," depriving him of his constitutional right to effective assistance of counsel."

The Sixth Amendment to the United States Constitution guarantees in all criminal prosecutions that the accused shall have "the right to the *reasonably effective* assistance of counsel." *Monreal v. State*, 947 S.W.2d 559, 564 (Tex. Crim. App. 1997). The Sixth Amendment also guarantees a defendant the right to "conflict-free" representation. *Ex parte McCormick*, 645 S.W.2d 801, 802 (Tex. Crim. App. 1983); *see Orgo v. State*, 557 S.W.3d 858, 861 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Most claims of ineffective assistance of counsel are reviewed under the analytical framework set forth in *Strickland v. Washington*. 466 U.S. 668, 687 (1984). Although *Strickland* governs claims of ineffective assistance of counsel based on attorney error, claims involving an actual conflict of interest are reviewed

22

under *Cuyler v. Sullivan*. 446 U.S. 335, 350 (1980); *see also Odelugo v. State*, 443 S.W.3d 131, 136 (Tex. Crim. App. 2014) ("[T]he proper standard by which to analyze claims of ineffective assistance of counsel due to a conflict of interest is the rule set out in *Cuyler v. Sullivan*[.]" (quoting *Acosta v. State*, 233 S.W.3d 349, 356 (Tex. Crim. App. 2007))).

To resolve this issue on appeal, we must first decide which standard to apply. *See Thompson v. State*, 94 S.W.3d 11, 16 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd). If trial counsel had an actual conflict of interest, the test from *Cuyler* should be applied. If trial counsel did not have an actual conflict, the test from *Strickland* is the appropriate standard by which to assess Houston's ineffectiveness claim. The critical difference between the *Cuyler* test and the *Strickland* test is that there is a lesser burden when the claim of ineffective assistance of counsel involves a conflict of interest than when a claim is based on attorney error. *Id.*

Under *Cuyler*, a defendant demonstrates a violation of his right to reasonably effective assistance of counsel if he can show that (1) his counsel was burdened by an actual conflict of interest; and (2) the conflict had an adverse effect on specific instances of counsel's performance. 446 U.S. at 348-50; *see Acosta*, 233 S.W.3d at 356; *Monreal*, 947 S.W.2d at 565. If the appellant shows that both requirements are met, appellate courts irrefutably presume prejudice occurred. *Mitchell v. State*, 989 S.W.2d 747, 748 (Tex. Crim. App. 1999).

Until a defendant shows his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance. *Cuyler*, 446 U.S. at 350. An actual conflict of interest exists if counsel is required to choose between advancing her client's interest in a fair trial or advancing other interests (perhaps her own) to the detriment of her client's interest. *See Monreal*, 947 S.W.2d at 564; *Odelugo*, 443 S.W.3d at 136. For conflicts between clients, "[a]n 'actual conflict' exists when an attorney represents two

23

clients whose interests in the outcome of a matter are different." *Ramirez v. State*, 13 S.W.3d 482, 486-87 (Tex. App.—Corpus Christi-Edinburg 2000, pet. dism'd). The conflict, however, must be more than merely speculative. *James v. State*, 763 S.W.2d 776, 778-79 (Tex. Crim. App. 1989). A potential conflict of interest is insufficient to reverse a conviction. *Cuyler*, 446 U.S. at 350; *Goody v. State*, 433 S.W.3d 74, 79 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). "[A] potential conflict may become an actual conflict, but [an appellate court need not] speculate about a strategy an attorney might have pursued, but for the existence of a potential conflict of interest, in the absence of some showing that the potential conflict became an actual conflict." *Routier v. State*, 112 S.W.3d 554, 585 (Tex. Crim. App. 2003).

"The most likely scenario for a conflict of interest to develop is when an attorney represents two co-defendants in the same case, i.e., multiple or joint representation." *Thompson*, 94 S.W.3d at 16; *see also Beets v. Scott*, 65 F.3d 1258, 1271 (5th Cir. 1995) (concluding that "*Strickland* more appropriately gauges an attorney's conflict of interest that springs not from multiple client representation but from a conflict between the attorney's personal interest and that of his client."). In that type of situation, there is a high probability of prejudice, and it is difficult to prove. *Thompson*, 94 S.W.3d at 17-18. There is "a distinction between concurrent representation and prior representation." *Id.* at 18; *see also Mickens v. Taylor*, 535 U.S. 162, 176 (2002) (noting that Supreme Court has not decided whether "*Sullivan* should be extended" to "cases of successive representation" and that question of whether it should remains "an open question"). "If a lawyer represents two or more co-defendants in the same matter, she is legally and ethically deprived of utilizing the time-honored defense of blaming the other defendant." *Thompson*, 94 S.W.3d at 19. For that reason, "the automatic presumption of prejudice is quite valid." *Id.* An actual conflict may also be present when an attorney represents a defendant and a

witness called during the defendant's trial. *See Ramirez*, 13 S.W.3d at 485, 489 (determining that there was actual conflict where lawyer represented simultaneously defendant and witness who testified that defendant made incriminating statements in prison because attorney "was forced to choose between what was best for appellant (aggressively cross-examining Crabb) and what was best for Crabb (protecting the confidentiality of information obtained as a result of her representation of him)"). Although multiple representation is the most likely scenario, it is not the only possibility in which an actual conflict could result. *See Acosta*, 233 S.W.3d at 354 (concluding that conflict could occur where defendant's "trial counsel actively represented the interests of a third party during the [defendant]'s trial").

In this case, there were no co-defendants. Although the record shows that one of Houston's attorneys represented Father years ago in a criminal case, the limited record does not establish any connection between the current case and the attorney-client relationship with Father, which ended years before. *See Perillo v. Johnson*, 205 F.3d 775, 798-99 (5th Circ. 2000) (noting that where "defense counsel's prior representation unambiguously terminated before the second representation began, the possibility that defense counsel's continuing obligation to his former client will impede his representation of his current client is generally much lower"); *United States v. Olivares*, 786 F.2d 659, 663 (5th Cir. 1986) (noting that lawyer's representation of former client "was terminated long before" trial of subsequent client and that "nothing in the record indicates" that lawyer had prior client's "interest in mind during the trial" and concluding that "'active representation of conflicting interests' connotes more than merely cross-examining a former client"); *see also Cuyler*, 446 U.S. at 337-39 (addressing situation in which three defendants were represented by same two lawyers in successive trials and in which one lawyer admitted he did not put on defense in first trial because it would have prejudiced remaining two

25

cases by exposing potential defense witnesses). In other words, the record does not show that Houston's attorney was "actively represent[ing] conflicting interests." *Cuyler*, 446 U.S. at 350.

Based on the record before us, "it is not possible to identify . . . an actual conflict of interest arising from appellant's counsel's prior representation" of Father. *See Thompson*, 94 S.W.3d at 14, 19 (determining that record did not show actual conflict where it showed only that lawyer previously represented inmate whom defendant "claimed placed the shanks in his cell" that formed basis for defendant's charges); *see also Perez v. State*, 352 S.W.3d 751, 757 (Tex. App.—San Antonio 2011, no pet.) (concluding that lawyer's "former representation of the State did not become an actual conflict of interest"). For that reason, we conclude that *Strickland*, not *Cuyler*, should apply in this case. *See Thompson*, 94 S.W.3d at 19; *see also Ex parte McFarland*, 163 S.W.3d 743, 759 & n.52 (Tex. Crim. App. 2005) (noting that alleged former client never testified at trial and was not subject to cross-examination and explaining that "[a]t best, appellant has shown a potential conflict of interest which does not support reversal").

To demonstrate ineffective assistance of counsel under *Strickland*, a defendant must establish by a preponderance of the evidence both deficient performance by counsel and prejudice. *See* 466 U.S. at 687; *Miller v. State*, 548 S.W.3d 497, 499 (Tex. Crim. App. 2018). First, the defendant must show that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 687-88; *Ex parte Scott*, 541 S.W.3d 104, 115 (Tex. Crim. App. 2017). Next, the defendant must show the existence of a reasonable probability that the result of the proceeding would have been different absent his counsel's deficient performance. *Strickland*, 466 U.S. at 694; *Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App. 2017). "Failure to make the required showing of either

26

deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700; *see Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001).

To satisfy the first prong, the defendant must overcome the strong presumption that his trial "counsel's conduct falls within the wide range of reasonable professional assistance" and might be considered sound trial strategy. *Strickland*, 466 U.S. at 689; *see Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002); *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). A reviewing court must be highly deferential to trial counsel and must strive to review the representation without "the distorting effects of hindsight." *Strickland*, 466 U.S. at 689; *see Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011); *Thompson*, 9 S.W.3d at 813. In addition, evaluations of effectiveness are based on "the totality of the representation," *Frangias v. State*, 450 S.W.3d 125, 136 (Tex. Crim. App. 2013), and allegations of ineffectiveness must be firmly established by the record, *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001).

Regarding the second prong, the requirement that there be a reasonable probability that the results would have been different means "a probability that is sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see Thompson*, 9 S.W.3d at 812. "Prejudice to the [defendant] from counsel's deficient performance is judged by 'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Ex parte Amezquita*, 223 S.W.3d 363, 366 (Tex. Crim. App. 2006) (quoting *Ex parte Chandler*, 182 S.W.3d 350, 353 (Tex. Crim. App. 2005)). "It will not suffice for [the defendant] to show 'that the errors had some conceivable effect on the outcome of the proceeding.'" *Perez v. State*, 310 S.W.3d 890, 894 (Tex. Crim. App. 2010) (quoting *Strickland*, 466 U.S. at 693).

In general, direct appeals do not provide a useful vehicle for presenting ineffectiveness claims because the record for that type of claim "is generally undeveloped." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005); *see Prine v. State*, 537 S.W.3d 113, 117 (Tex. Crim. App. 2017). In this case, Houston did not make an ineffective-assistance claim in his motion for new trial, and the trial court did not conduct a hearing on the motion. Before their representation is deemed ineffective, trial attorneys should be afforded the opportunity to explain their actions. *Goodspeed*, 187 S.W.3d at 392. If a trial attorney has not been afforded that opportunity, a reviewing court should not find him to be deficient unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Nava v. State*, 415 S.W.3d 289, 308 (Tex. Crim. App. 2013) (quoting *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012)). "'When the record is silent and does not provide an explanation for the attorney's conduct, the strong presumption of reasonable assistance is not overcome,' and appellate courts 'do not engage in speculation to find ineffective assistance when the record is silent as to an attorney's strategy at trial.'" *Schneider v. State*, 623 S.W.3d 38, 41 (Tex. App.—Austin 2021, pet. ref'd) (quoting *Ex parte Torres*, No. 08-10-00330-CR, 2012 WL 1431660, at *3 (Tex. App.—El Paso Apr. 25, 2012, no pet.) (op., not designated for publication)).

Although made as part of his actual-conflict argument, Houston notes that his attorneys did present the defensive theory that someone else may have had an opportunity to abuse J.C. and that the abuse may have occurred while she was in Father's custody, but Houston asserts that his attorneys "did not seize the opportunity to accuse or aggressively pursue [Father]'s culpability or knowledge about what may have truly happened to the complainant." In

making this claim, Houston focuses on the cross-examination of Father's mother and asserts that it was too limited.

The record is silent regarding Houston's strategy concerning the defensive theory of alternative offenders. *See Schneider*, 623 S.W3d at 41. Like decisions regarding opening statements and closing arguments, *see Habib v. State*, 431 S.W.3d 737, 742 (Tex. App.—Amarillo 2014, pet. ref'd), *abrogated on other grounds by Anastassov v. State*, 664 S.W.3d 815 (Tex. Crim. App. 2022), decisions regarding the cross-examination of witnesses are "inherently a matter of trial strategy," *see Lansink v. State*, No. 01-12-00121-CR, 2014 WL 690291, at *3 (Tex. App.—Houston [1st Dist.] Feb. 20, 2014, no pet.) (mem. op., not designated for publication); *see also Ex parte McFarland*, 163 S.W.3d at 756 ("Cross-examination is inherently risky, and a decision not to cross-examine a witness is often the result of wisdom acquired by experience in the combat of trial."). "We must presume that trial counsel's decision to limit cross-examination . . . was based on reasonable trial strategy." *Lara v. State*, No. 11-22-00311-CR, 2024 WL 2751289, at *8 (Tex. App.—Eastland May 30, 2024, pet. ref'd) (mem. op., not designated for publication).

Additionally, "[g]iven an emotional and tragic case such as this, it is entirely reasonable or foreseeable that a defense attorney would limit his cross-examination out of fear of alienating a jury or coming across as too aggressive. We decline to second-guess appellant's trial counsel's strategy or inquire as to whether another attorney would have pursued a different course." *See Navarro v. State*, 154 S.W.3d 795, 799 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd); *see also Romero v. State*, No. 14-07-00657-CR, 2008 WL 5244890, at *4 (Tex. App.—Houston [14th Dist.] Dec. 18, 2008, no pet.) (mem. op., not designated for publication) ("[T]here is a possibility that appellant's trial counsel thought she might alienate the jury if she

29

cross-examined the brother and the mother of a twelve-year-old victim of sexual assault."). Given the nature of the allegations in this case and the evidence of guilt, we cannot conclude that Houston's trial attorneys' decision to put forth the alternative-perpetrator argument without pursuing that defense in relation to Father in the manner Houston suggests on appeal was so outrageous that no competent attorney would have done the same. *See Nava*, 415 S.W.3d at 308; *see also Rodriguez v. State*, 678 S.W.3d 375, 388 (Tex. App.—Dallas 2023, pet. ref'd) (noting that alternative perpetrator evidence may be excluded under Rule 403 and that "[i]t is not sufficient for a defendant merely to offer up unsupported speculation that another person may have committed the crime"). Accordingly, we conclude that Houston has not overcome the strong presumption of reasonable assistance. *See Schneider*, 623 S.W3d at 41.

To the extent that Houston's brief can be read as asserting that his attorneys were ineffective for failing to call Father or other witnesses to further develop the alternative-perpetrator theory, Houston has not shown that Father or any other witnesses would have been available or what their testimonies would have been. Before a defendant can claim that his trial counsel provided ineffective assistance by failing to call witnesses, the defendant must show that there were witnesses available and that their testimonies would have helped him. *See King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983); *Brennan v. State*, 334 S.W.3d 64, 79 (Tex. App.—Dallas 2009, no pet.); *Tutt v. State*, 940 S.W.2d 114, 121 (Tex. App.—Tyler 1996, pet. ref'd). Absent this type of showing, an ineffectiveness claim regarding the failure to call witnesses fails. *Rodriguez v. State*, 459 S.W.3d 184, 199 (Tex. App.—Amarillo 2015, pet. ref'd); *see also Lair v. State*, 265 S.W.3d 580, 594 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd) (explaining that "[t]he decision whether to present witnesses is largely a matter of trial strategy").

30

For these reasons, we overrule Houston's second issue on appeal.[6]

**State's Opening Statement and Closing Argument**

In his third issue on appeal, Houston contends that "[t]he State blatantly disregarded the limits set on arguments to the jury" to the detriment of "his constitutional rights to a fair trial with the protections guaranteed by due process of law." More specifically, he notes that in the State's opening statement and in its closing argument, the prosecution repeatedly asked the jury to listen to and believe J.C. Further, he highlights that the State indicated in its opening statement that J.C. might not be able to speak with the jury about the abuse because she had difficulty talking about it in the past. He contends that these comments "begged the jury to believe [J.C.] regardless of what was presented at trial and lowered the State's burden of proof to a hunch rather than beyond a reasonable doubt." Next, he asserts that in the State's closing, the prosecutor "instruct[ed] [the jury] to find him guilty." He characterizes that instruction as directions to disregard the beyond-a-reasonable-doubt requirement and find him guilty regardless

---

[6] On appeal, Houston states that if this Court overrules this issue, he "requests leave" from this Court "to re-raise the issue through a writ of habeas corpus, along with additional claims not in the record but relevant through a writ." This Court lacks original habeas corpus jurisdiction in criminal cases. *See* Tex. Const. art. V, § 6; Tex. Gov't Code § 22.221(d) (limiting original habeas corpus jurisdiction of courts of appeals to situations where relator's liberty is restrained by virtue of order, process, or commitment issued by court or judge in civil case); *see also* Tex. Code Crim. Proc. art. 11.05 (vesting "power to issue the writ of habeas corpus" in "[t]he Court of Criminal Appeals, the District Courts, the County Courts, or any Judge of said Courts"). As an intermediate appellate court, our habeas corpus jurisdiction in criminal matters is appellate only. *See* Tex. Gov't Code § 22.221(d); *see also In re Wilkins*, No. 03-20-00381-CV, 2020 WL 5608486, at *1 (Tex. App.—Austin Sept. 17, 2020, orig. proceeding) (mem. op.). Accordingly, should Houston desire to seek habeas relief, he would need to comply with the requirements for obtaining habeas relief set out in the Code of Criminal Procedure. *See* Tex. Code Crim. Proc. art. 11.07 ("This article establishes the procedures for an application for writ of habeas corpus in which the applicant seeks relief from a felony judgment imposing a penalty other than death.").

of the evidence presented at trial. He contends that the improper comments allowed the jury to convict him "on a burden less than beyond a reasonable doubt."

To preserve an improper jury argument complaint, the defendant must: (1) object; (2) request an instruction to disregard; and (3) move for mistrial. *See Harris v. State*, 784 S.W.2d 5, 12 & n.4 (Tex. Crim. App. 1989). Even if the argument is egregious and an instruction to disregard would not cure the harm caused by the improper argument, the error is not preserved if the defendant did not object. *See Valencia v. State*, 946 S.W.2d 81, 82-83 (Tex. Crim. App. 1997); *see also Johnson v. State*, 68 S.W.3d 644, 655 (Tex. Crim. App. 2002) (stating failure to object forfeits claim that prosecutor's comments were improper).

In this case, Houston's attorneys did not make any objection to the allegedly improper comments. *See* Tex. R. App. P. 33.1; *see also Herrera v. State*, 676 S.W.3d 896, 906 (Tex. App.—Eastland 2023, no pet.) ("Errors in closing argument require a specific and timely objection."). Accordingly, we must conclude that Houston has failed to preserve this issue for appellate consideration. *See Herrera*, 676 S.W.3d at 906; *see also Garza v. State*, 435 S.W.3d 258, 260-61 (Tex. Crim. App. 2014) (noting that "even constitutional errors . . . may be forfeited on appeal if an appellant failed to object at trial").

In a footnote on this issue, Houston presents an ineffectiveness challenge that provides in its entirety as follows:

> To the extent this Court finds these trial errors were not preserved for appellate review, trial counsel was ineffective. *See also Strickland v. Washington*, 466 U.S. 668 (1984); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Porter v. McCollum*, 558 U.S. 30 (2009); *Lopez v. State*, 343 S.W.3d 137 (Tex. Crim. App. 2011); *Thompson v. State*, 9 S.W.3d 808 (Tex. Crim. App. 1999); *Andrews v. State*, 159 S.W.3d 98 (Tex. Crim. App. 2005).

Houston's ineffectiveness challenge is multifarious and may be rejected on that basis. *See Davidson v. State*, 249 S.W.3d 709, 717 n.2 (Tex. App.—Austin 2008, pet. ref'd) (explaining that issue containing "more than one specific ground of error is a multifarious one" and that appellate courts "may refuse to consider it"); *see also Buntion v. State*, 482 S.W.3d 58, 105 n.16 (Tex. Crim. App. 2016) (deciding not to address claim that rendered defendant's "point of error multifarious"). Even electing to address this complaint in the interests of justice, we would be unable to sustain this issue. *See Davidson*, 249 S.W.3d at 717 n.2 (explaining that appellate courts "may consider multifarious issues if [they] can determine, with reasonable certainty, the alleged error about which the complaint is made").

As an initial matter, we note that other than referring to cases without pinpoint citations, Houston has not attempted to explain what significance those cases bear on his undefined ineffectiveness claim or include any legal analysis addressing the two prongs that must be met under *Strickland* to successfully make an ineffectiveness claim.[7] *See* Tex. R. App. 38.1 (setting out requirements for appellant's brief); *see also Ladd v. State*, 3 S.W.3d 547, 570 (Tex. Crim. App. 1999) (determining that defendant was "preclude[d]" from any relief for ineffectiveness claim where defendant "made no effort to prove the prejudice prong of the *Strickland* test"); *Adekeye v. State*, 437 S.W.3d 62, 76 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (overruling ineffectiveness challenge concerning closing argument as inadequately briefed where defendant provided "absolutely no legal analysis" and explaining that "[i]t is not the role of this court to supply legal arguments on behalf of the parties").

---

[7] It is worth noting that Houston included the same footnote in his prior issue and listed the same six cases without any explanation regarding the significance of those cases. Houston's second issue already presented an ineffectiveness claim.

Regardless, as with the previous claim of ineffectiveness, no claim of ineffectiveness related to the opening statement or closing argument was made after the trial, and Houston's attorneys have not been given the chance to explain their strategy for not objecting to the State's comments. Moreover, we cannot conclude that failing to object was so outrageous that no competent attorney would have similarly not objected. *Nava*, 415 S.W.3d at 308. As set out above, Houston contends that the State told the jury to believe J.C. in its opening statement and its closing argument and asserts that this lowered the State's burden of proof to less than beyond a reasonable doubt. However, the first three comments, when shown in context, did not attempt to lower the State's burden and in fact reminded the jury of the beyond-a-reasonable-doubt burden.

First, the prosecution in its opening stated as follows:

Listen and believe, members of the jury. We're going to ask you to listen to believe the little 13-year-old girl, who was brave enough to capture Matthew Houston's voice as he sexually assaulted her. My name is Jim Mattox along with my co-counsel Cassie Benoist and we represent the State of Texas through Caldwell County. And through this case we are going to present to you the case. And by the end of this trial, we are going -- we are going to have proven to you beyond a reasonable doubt that Matthew Houston sexually assaulted a child, a 13-year-old little girl, by the name of [J.C.].

In the second referenced portion of the State's opening, the prosecution explained that J.C. might have difficulty speaking about the allegations, but then informed the jury that it could rely on the audio recording and reminded the jury of the State's burden to prove the crime beyond a reasonable doubt as follows:

Members of the jury, we are going to ask [J.C.] to come up and try to speak with y'all. You're going to hear from her. And we're going to hope she can keep it together. We're going to hope she can tell you about what is going on and what had happened to her. Don't forget, just like the evidence will show and the

34

evidence has shown, she may not want to speak much. She may not want to speak a lot about it, but that's where we ask y'all to listen and believe. Listen and believe the audio recording that she was so brave to capture for us and we're going to play for y'all.

At the end of this trial, I'm going to get back up here along with my co-counsel Cassie Benoist and at that point we are going to ask you and tell you to find Matthew Houston and find him guilty beyond a reasonable doubt of sexually assaulting this little girl. Listen and believe [J.C.].[8]

During the State's closing argument, the prosecution asked the jury to "[l]isten and believe [J.C.] as she sat here and had the courage to tell what happened to her to tell you how this man took his penis and put it inside her and sexually assaulted her." The State then went over parts of the jury charge and explained that it was "required to prove beyond a reasonable doubt" the elements of the charged offense and that the jury should find him guilty only if it believed the State "ha[s] proved . . . beyond a reasonable doubt that Matthew Houston is guilty of sexual assault of a child."

Based on the full context in which the statements were made, we cannot agree with Houston's suggestion that the State's comments suggested that the State's burden was less than proving the offense beyond a reasonable doubt. Moreover, even if these comments were not proper, Houston's attorneys could have reasonably concluded that it was unnecessary to object because the trial court correctly instructed the jury on the burden of proof in the charge. *See Brown v. State*, 482 S.W.3d 157, 164 (Tex. App.—Texarkana 2015, no pet.); *see also Andrews v. State*, 159 S.W.3d 98, 103 (Tex. Crim. App. 2005) (explaining that when appellate

---

[8] In his brief, Houston asserts that the State told the jury to believe J.C. "even if she cannot testify to facts or tell you what happened." That quote does not appear in the referenced portions of the record, and we have been unable to find that or similar language in the State's opening statement or closing argument.

court "can conceive [of] potential reasonable trial strategies that counsel could have been pursuing," court "simply cannot conclude that counsel has performed deficiently").

In the last referenced portion of the State's rebuttal, the prosecution asserted that J.C. was telling the truth and did not provide coached testimony before discussing how J.C. testified that she tried to commit suicide because of the abuse. The State then concluded by stating "[t]hat's the little girl we are asking you to listen to and believe." These statements were made after Houston presented his defense that J.C. lied about the allegations and asserted in his closing that children can recant allegations when they lie; that J.C. was dishonest and had behavioral issues; that J.C. had previously told individuals involved in investigating the case that she made up the allegations because she wanted attention, was mad, and did not want to return to Mother's home; that the jury would have to believe J.C. fully to convict; and that J.C. rehearsed her testimony with the prosecutors.

In light of Houston's defense and closing argument, his attorneys could have reasonably concluded that "[a]s a response to the defense argument, the prosecutor's rebuttal was proper." *Sanders v. State*, 191 S.W.3d 272, 276 (Tex. App.—Waco 2006, pet. ref'd); *see id.* at 275 (noting that State's argument was that evidence did not support conclusion that victim lied); *see also Canada v. State*, 547 S.W.3d 4, 23 (Tex. App.—Austin 2017, no pet.) (noting that response to opposing counsel's argument is proper jury argument). Further, they could have determined that the prosecutor's arguments "were a reasonable deduction from the evidence on the credibility issues in the case." *See Sanders*, 191 S.W.3d at 275-76; *see also Loar v. State*, 627 S.W.2d 399, 401 (Tex. Crim. App. 1981) (upholding propriety of argument by State that "if you want to acquit, then you have to believe that the three police officers got together and lied

36

about everything"); *Canada*, 547 S.W.3d at 22 (noting that reasonable deductions from evidence is one of permissible categories of jury argument).

In his final set of arguments in this issue, Houston contends that the State improperly "***instructed*** the jury to find [him] guilty—not to consider the testimony with full consideration of the highest burden of proof under the law." The referenced argument was made as follows:

> Members of the jury, [J.C.] as she testified to you from right here she was -- is only 15 years of age. Not even close to the 17 year mark. And by Defendant's sexual organ. I already covered this a little bit. That he used his penis to violate this little girl. And should you believe, as we do, and as we have proven to you beyond a reasonable doubt that Matthew Houston is guilty of sexual assault of a child, we are going to ask you and we are going to instruct y'all to find him guilty. And you will sign here and leave this blank as we believe we've shown you that he is guilty beyond a reasonable doubt.

Although the State did say it was instructing the jury to find Houston guilty, the prosecution did so only after explaining both that the jury should find him guilty only if the State proved beyond a reasonable doubt that he was guilty and that the State had proven beyond a reasonable doubt that Houston sexually abused J.C. with his penis. The State then quickly reminded the jury again that it had the burden of proving Houston's guilt beyond a reasonable doubt. Similar instructions were included in the jury charge.

Given the context in which the "instruction" was given, Houston's trial attorneys could have reasonably concluded that the State's argument was not improper because it was a summation of the evidence. *See Canada*, 547 S.W.3d at 22 (explaining that summation of evidence is proper jury argument); *see also Kuhn v. State*, 393 S.W.3d 519, 538-39 (Tex. App.—Austin 2013, pet. ref'd) ("If a jury argument is proper, counsel cannot be ineffective in failing to object to it.").

37

Accordingly, even assuming that the ineffectiveness claim is properly before this Court, we cannot conclude that Houston's attorneys provided ineffective assistance by failing to object to portions of the State's opening statement and closing argument. *See Strickland*, 466 U.S. at 689; *see also Evans v. State*, 60 S.W.3d 269, 273 (Tex. App.—Amarillo 2001, pet. ref'd) (noting that trial counsel's decision regarding whether to object during closing argument is "frequently a matter of legitimate trial strategy" and noting that without any "indicat[ion] why counsel at bar withheld objection, . . . we cannot say that the record before us sufficiently rebuts the strong presumption that counsel exercised reasonable professional judgment").

For all these reasons, we overrule Houston's third issue on appeal.

## CONCLUSION

Having overruled Houston's issues on appeal, we affirm the trial court's judgment of conviction.

_____

Karin Crump, Justice

Before Chief Justice Byrne, Justices Crump and Ellis

Affirmed

Filed:   January 8, 2026

Publish